J-S20035-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| EUGENE LEWIS | : | |
| | : | |
| Appellant | : | No. 3214 EDA 2025 |

Appeal from the Order Entered November 6, 2025
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s):  CP-39-CR-0000118-2024

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED JULY 1, 2026**

Appellant, Eugene Lewis, appeals from the order entered in the Lehigh County Court of Common Pleas, which denied his motion in *limine* seeking to dismiss all charges on the basis that the charges were barred by the compulsory joinder statute.[1]  We affirm.

The trial court set forth the relevant facts and procedural history of this case as follows:

> On October 11, 2021, Trooper Matthew Kelly of the Pennsylvania State Police [("PSP")], Troop M Fogelsville barracks, assigned to the criminal investigation unit, responded to 1790 Riverbend Road, … Lehigh County, for a report of an overdose/deceased female.  When Trooper Kelly arrived on scene, he found the deceased, Leslie Sherman [("Victim")], in her bedroom lying on the floor at the base of a bed mattress.

_____

[1] 18 Pa.C.S.A. §110(1).

Trooper Kelly assessed the scene, secured the home, and spoke with Michael Peters, [Victim's] roommate and with whom [Victim] had a daughter, in order to gather information in an effort to build a timeline leading up to [Victim's death] and to determine the cause of death. …Mr. Peters had found [V]ictim deceased. Mr. Peters explained to Trooper Kelly that both he and [Victim] were active heroin and fentanyl users and that Mr. Peters would provide the drugs to [Victim] as needed. Trooper Kelly also received consent from Mr. Peters to search the residence.

Trooper Kelly, along with the forensic services unit, entered the bedroom where [Victim] was found. Multiple glassine baggies labeled "BROKE" and stamped in red ink with Benjamin Franklin on them were located in direct proximity to [V]ictim's body. These baggies were all empty. … Two cell phones were also located within the bedroom. The forensic services unit photographed and documented the evidence…. [T]he evidence was secured and stored [at the PSP barracks in Fogelsville.]

Within the next couple of days, Trooper Kelly reached out to Mr. Peters to schedule a time for him to come to the PSP barracks in Fogelsville to be interviewed. …[A]s Trooper Kelly was setting up the interview room, he ran into Trooper Michael Acevedo of the vice and narcotics unit in the hallway. Armed with the knowledge that Trooper Acevedo had the ability to investigate drug sales and with the intent of "referring" Mr. Peter's supplier to Trooper Acevedo, Trooper Kelly advised Trooper Acevedo of the circumstances surrounding the overdose death and that Mr. Peters, the interviewee, may have knowledge of who sold him the drugs. Consequently, Trooper Kelly inquired if Trooper Acevedo would like to join the interview to conduct his own investigation into the supplier.

Trooper Kelly recognized that the crime investigation unit and the vice and narcotics unit serve distinct purposes within the PSP, … each designed with different functions, strengths, and investigative approaches. The crime investigation unit focuses on investigating and solving crimes that already have occurred, with its members working openly rather than undercover. In contrast, the vice and narcotics unit operates covertly, with officers

assuming undercover roles to investigate ongoing criminal activity, as well as potential crimes before they occur.

Being aware that [Victim] had overdosed, and also being familiar with the large number of overdoses in the Lehigh Valley due to fentanyl, Trooper Acevedo expressed an interest in speaking with Mr. Peters at the scheduled interview time. Trooper Acevedo's goal was to identify Mr. Peters' supplier and get him off the street. Trooper Acevedo spoke with Mr. Peters with regard to the drug sales (i.e., how often Mr. Peters bought drugs from his supplier, if there were additional suppliers that Mr. Peters dealt with, the name of the supplier, and the telephone number used to contact the supplier). Indeed, during this interview process, Mr. Peters stated that for years he would typically purchase the controlled substances (heroin and fentanyl) from his supplier known as "G" by meeting at different public locations in Hellertown[, Northampton County.] Specifically, the drug transactions occurred at locations such as the Wendy's or Turkey Hill convenience store in Hellertown. To effectuate the drug deal, Mr. Peters would call or text "G" and order two bundles of heroin at a time. Mr. Peters explained that "G' was his exclusive supplier. [Victim] never acquired heroin or fentanyl directly from [Appellant]. Mr. Peters also provided the telephone number of his supplier.

Trooper Acevedo then left the interview room for Trooper Kelly to conduct his interview with Mr. Peters. Mr. Peters related to Trooper Kelly that on October 9, 2021, Mr. Peters contacted [Appellant] in order to purchase two bundles of heroin from him. Mr. Peters met [Appellant] at Wendy's in Hellertown to make the drug transaction. After Mr. Peters purchased the two bundles and returned home, he placed three packets in the kitchen cabinet for [Victim's] later use while he used the remainder himself. Mr. Peters indicated that these glassine packets had the word "BROKE" on them.

After the interview, Trooper Kelly continued his investigation by utilizing closed source and open-source information of the [PSP] databases to attempt to learn the identity of the seller. Trooper Kelly also contacted the Office of the Lehigh County District Attorney with regard to filing a criminal complaint alleging drug delivery resulting in death.

Shortly after speaking with Mr. Peters, Trooper Acevedo opened an investigation involving [the individual known as "G"], later identified as [Appellant], as the target. Mr. Peters agreed to work with Trooper Acevedo by assuming the role of confidential informant and participating in controlled purchases of heroin from the [individual] known as "G." Mr. Peters participated in two controlled buys under the supervision of Trooper Acevedo. … Trooper Kelly was not involved in these controlled purchases in any way nor ever dealt with Mr. Peters as a confidential informant.

In both purchases, one on October 27, 2021 and the other on November 2, 2021, Mr. Peters bought two bundles of heroin from [Appellant] at the Friendly Food Mart located [in] Northampton County while under constant surveillance by Trooper Acevedo and his team of law enforcement personnel. During the second controlled purchase, a member of the Pennsylvania Office of the Attorney General consensualized Mr. Peters in order to utilize recording devices.

Trooper Acevedo communicated with Trooper Kelly that the packaging material of the drugs received on these dates through the controlled buys was the same as the packaging material of the drugs that Mr. Peters purchased from [Appellant] on October 9, 2021. Trooper Acevedo also confirmed to Trooper Kelly that the supplier's name was [Appellant]. The drugs acquired through these controlled purchases were secured at the Bethlehem barracks of the PSP until they were analyzed by the … Bethlehem Regional Laboratory pursuant to Trooper Acevedo's investigation. The drugs recovered from the October 27, 2021 and the November 2, 2021 controlled buys contained acetyl fentanyl and fentanyl.

On November 3, 2021, Trooper Acevedo [executed a search warrant of Appellant's residence.] … Trooper Acevedo also inquired [if] Trooper Kelly … would want to be present during the execution of the search warrant in case Trooper Kelly would have an opportunity to interview [Appellant] in conjunction with his open case. Trooper Kelly agreed and assisted with the search warrant by watching [Appellant's] girlfriend … and her two minor children located in the

residence, but the opportunity to interview [Appellant] did not present itself. Trooper Kelly was not involved in the active search of the residence.

A search of the residence yielded, *inter alia*, … two cell phones, one of which had been utilized to effectuate the drug transactions with Mr. Peters. The evidence seized as a result of the search warrant was transported by Trooper Acevedo to the [PSP] Bethlehem barracks and entered into inventory.

On November 3, 2021, in Northampton County, [Appellant] was charged with two counts [each] of possession with intent to deliver a controlled substance [("PWID")], … possession of a controlled substance, … criminal use of a communication facility, and … dealing in proceeds of unlawful activities….

… [Appellant's] Northampton County case was resolved with a non-trial disposition when [Appellant] entered a guilty plea on November 1, 2022 to one count of criminal use of communication facility. [Appellant] received a sentence of [12 to 36 months'] incarceration ….

Dr. Michael Johnson of Forensic Pathology Associates performed an autopsy [of Victim] on October 12, 2021, … and the Autopsy Report was completed on December 17, 2021. Trooper Kelly received a copy of the Autopsy Report sometime after December 30, 2021. The cause of death was determined to be mixed drug toxicity of diphenhydramine, acetyl fentanyl, fentanyl, and loperamide. Trooper Kelly forwarded a copy of the Autopsy Report to the Office of the Lehigh County District Attorney.

… On June 15, 2022, … [Trooper Kelly obtained] search warrants … for [Appellant's] cell phones…. Additionally, Trooper Kelly obtained a search warrant for [Victim's] cell phone that was retrieved from the evidence room of the [PSP] Fogelsville barracks. The cell phones were provided to the … computer crimes unit for analysis [at] the PSP Fogelsville barracks. However, after several months the cell phones had yet to be analyzed due to a backlog. Consequently, in October 2022, Trooper Kelly took the cell phones to the Lehigh County drug task force digital forensics

lab for analysis. While the analysis was completed in a timely fashion, Trooper Kelly did not complete his review of the voluminous cell phone data until March 2023.

At that time, Trooper Kelly reached out to the Office of the Lehigh County District Attorney and provided them with the analysis of the cell phones. The prosecutor requested that Trooper Kelly attempt to speak with [Appellant] and interview him. However, [Appellant] was incarcerated in Fayette County Correctional Institute, and an interview could not be effectuated by Trooper Kelly due to distance. Therefore, Trooper Marc Chieffallo of Troop B conducted an interview with [Appellant] in Fayette County on June 28, 2023. On July 26, 2023, Trooper Kelly submitted the glassine baggies to the [PSP] Bethlehem crime lab for analysis of the residue therein. On August 21, 2023, Trooper Kelly received the results of the analysis from the Bethlehem crime lab.

On August 30, 2023, Trooper Kelly conducted another interview with Mr. Peters in order to clarify information and solidify the timeline.

On September 20, 2023, at the direction of the Lehigh County Office of the District Attorney, Trooper Kelly filed charges in the within matter. … [Appellant was charged with drug delivery resulting in death and PWID.]

(Trial Court Opinion, filed 11/6/25, at 2-12) (footnotes and citations omitted).

On August 12, 2025, Appellant filed a motion in *limine*, seeking to dismiss all charges. Appellant argued that the charges were barred by the compulsory joinder statute because the Northampton County charges and the charges in this case stemmed from the same criminal episode. Following an evidentiary hearing, the court denied Appellant's motion on November 6, 2025. On December 8, 2025, Appellant filed a notice of appeal under

Pa.R.A.P. 313.[2]  The court did not order, and Appellant did not file, a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issue for our review:

> Should all charges against [Appellant] be dismissed pursuant to 18 Pa.C.S.[A.] § 110 where the Commonwealth was required to join these charges with those filed [in Northampton County]?

(Appellant's Brief at 4).

Appellant asserts that Trooper Acevedo was aware of the investigation into Victim's death at the time that Appellant was changed in the Northampton County case, and those charges resulted in a conviction.  Appellant argues that both offenses occurred within a single judicial district because prosecution of a drug delivery resulting in death charge is appropriate either where the sale took place or where the victim died.  Appellant contends that because the sale of the drugs in this case occurred in Northampton County, both sets of charges occurred within the same judicial district.  Appellant further claims

_____

[2] Rule 313 provides that "[a]n appeal may be taken as of right from a collateral order of a trial court or other government unit."  Pa.R.A.P. 313(a).  "A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost."  Pa.R.A.P. 313(b).  "It is well settled in Pennsylvania that a defendant is entitled to an immediate interlocutory appeal as of right from an order denying a non-frivolous motion to dismiss on state or federal double jeopardy grounds."  ***Commonwealth v. Barber***, 940 A.2d 369, 376 (Pa.Super. 2007), *appeal denied*, 599 Pa. 686, 960 A.2d 835 (2008).  "Because the protection of the compulsory joinder of charges statute is in the nature of protection against double jeopardy, an order denying a motion to invoke that statute's protection is similarly subject to immediate appeal."  ***Id.***

- 7 -

that both sets of charges involve the same criminal episode because there is a logical and temporal connection between the offenses. Appellant maintains that both sets of charges involve the sale of narcotics to Mr. Peters, occurring within a month of each other. Appellant claims that the investigations into both sets of charges were inseparably interrelated. Specifically, Appellant asserts that Trooper Kelly introduced Mr. Peters to Trooper Acevedo, the controlled buys in the Northampton County case confirmed Appellant's identity, Trooper Kelly participated in the search of Appellant's residence, and Trooper Kelly utilized a search warrant for the phones that were recovered from that search. Appellant contends that both sets of charges also have legal issues in common because they both involve the sale of narcotics. Appellant concludes that the charges in this case are barred by the compulsory joinder statute, and this Court must reverse the trial court's order and dismiss all charges. We disagree.

"Our standard of review of a motion to dismiss on the basis of compulsory joinder principles pursuant to [18 Pa.C.S.A.] §110 is *de novo*, and the scope of our review is plenary." **Commonwealth v. Pammer**, 232 A.3d 931, 933 (Pa.Super. 2020). The Crimes Code provides for compulsory joinder under the following circumstances:

> **§ 110. When prosecution barred by former prosecution for different offense**
>
> Although a prosecution is for a violation of a different provision of the statutes than a former prosecution or is based on different facts, it is barred by such former

prosecution under the following circumstances:

(1)     The former prosecution resulted in an acquittal or in a conviction as defined in section 109 of this title (relating to when prosecution barred by former prosecution for the same offense) and the subsequent prosecution is for:

    (i)    any offense of which the defendant could have been convicted on the first prosecution;

    (ii)    any offense based on the same conduct or arising from the same criminal episode, if such offense was known to the appropriate prosecuting officer at the time of the commencement of the first trial and occurred within the same judicial district as the former prosecution unless the court ordered a separate trial of the charge of such offense or the offense of which the defendant was formerly convicted or acquitted was a summary offense or a summary traffic offense; or

    (iii)   the same conduct, unless:

    (A)      the offense of which the defendant was formerly convicted or acquitted and the offense for which he is subsequently prosecuted each requires proof of a fact not required by the other and the law defining each of such offenses is intended to prevent a substantially different harm or evil; or

    (B)      the second offense was not consummated when the former trial began.

18 Pa.C.S.A. § 110(1).

Our Supreme Court has summarized Section 110(1)(ii) as follows:

As this Court has previously concluded, Subsection 110(1)(ii) of the compulsory joinder statute clearly and unambiguously contains four primary elements, which, if met, preclude a prosecution due to a former prosecution for a different offense:

    (1) the former prosecution must have resulted in an acquittal or conviction;

(2) the current prosecution is based upon the same criminal conduct or arose from the same criminal episode as the former prosecution;

(3) the prosecutor was aware of the instant charges before the commencement of the trial on the former charges; and

(4) the current offense occurred within the same judicial district as the former prosecution.

*Commonwealth v. Perfetto*, 652 Pa. 101, 117-18, 207 A.3d 812, 821 (2019) (internal citation omitted).

Our Courts have also provided the following explanations regarding whether a current prosecution is based upon the same criminal conduct as a former prosecution:

When examining whether a defendant has satisfied the second prong, which is also known as the logical relationship prong, courts should consider both the temporal and logical relationship between the charges to determine whether they arose from a single criminal episode. The logical relationship prong of the test requires a substantial duplication of issues of law and fact.

*Commonwealth v. Forrester-Westad*, 282 A.3d 811, 822 (Pa.Super. 2022) (internal citations and quotation marks omitted).

Such a determination depends ultimately on how and what the Commonwealth must prove in the subsequent prosecution. There is a substantial duplication of issues of fact if the Commonwealth's case rests solely upon the credibility of one witness in both prosecutions. There is no substantial duplication if proof … require[s] the introduction of the testimony of completely different police officers and expert witnesses as well as the establishment of separate chains of custody…. When determining if there is a duplication of legal issues, a court should not limit its

- 10 -

analysis to a mere comparison of the charges, but should also consider whether, despite the variation in the form of the criminal charges, there is a commonality of legal issues within the two prosecutions. It should be remembered, however, that the mere fact that the additional statutory offenses involve additional issues of law or fact is not sufficient to create a separate criminal episode since the logical relationship test does not require an absolute identity of factual backgrounds. Finally, in considering the temporal and logical relationship between criminal acts, we are guided by the policy considerations § 110 was designed to serve, which must not be interpreted to sanction volume discounting, procedural maneuvering, or … to label an enterprise an episode.

***Commonwealth v. Reid***, 621 Pa. 245, 257, 77 A.3d 579, 585-86 (2013) (internal citations and quotation marks omitted). The mere fact that evidence of one offense may be relevant and admissible in the prosecution of a second offense does not mean that the offenses must be deemed part of a single criminal episode. ***Commonwealth v. Spotz***, 563 Pa. 269, 278, 759 A.2d 1280, 1285 (2000), *cert. denied*, 534 U.S. 1104, 122 S.Ct. 902, 151 L.Ed.2d 871 (2002) (concluding that although separate cases had important common witness, joinder was not required because offenses triggered separate investigations and required testimony of different lay and expert witnesses). Further, in holding that a second prosecution was barred by the compulsory joinder rule, our Supreme Court found it significant that it was "not a situation where further investigation was required before additional charges could be brought against [the appellant]." ***Commonwealth v. Hude***, 500 Pa. 482, 492, 458 A.2d 177, 182 (1983).

Instantly, the trial court found that the current prosecution did not arise

from the same criminal episode as the Northampton County case. The court explained:

> With regard to location, … the record demonstrates that the Northampton County charges and the … Lehigh County charges occurred in separate geographic locations and under different circumstances. The Northampton County prosecution involved two controlled drug deliveries occurring in late October and early November 2021 at the Friendly Food Mart … in Bethlehem, Northampton County. These transactions were arranged and conducted under the exclusive supervision of the vice and narcotics unit, with the use of Mr. Peters as a confidential informant. Both deliveries were directly observed by law enforcement. In contrast, the … Lehigh County case involves the October 9, 2021 drug delivery that resulted in [Victim's] overdose in …Lehigh County. While the actual transfer of drugs occurred in … Northampton County, [V]ictim's death occurred in Lehigh County, and the case required a comprehensive death investigation, autopsy, forensic analysis, and follow-up interviews spanning nearly two years. Thus, while [Appellant's] criminal conduct may reflect an ongoing drug enterprise, the … Lehigh County overdose investigation and the Northampton County controlled buy cases were separate in location and character. As such, this court finds that this factor strongly supports the conclusion that they constitute distinct criminal episodes.
>
> [Additionally,] this court finds that the distinction between the two prosecutions is … underscored by the fact that they arose from two separate and independent investigations conducted by different divisions of the [PSP], each with unique mandates and investigative methods. Trooper Kelly of the criminal investigation unit led the … Lehigh County overdose investigation. His work centered on determining the cause and circumstances of [Victim's] death, involving overt investigative techniques such as crime scene analysis, evidence collection, autopsy coordination, search warrants for cell phone data, and communication with the Office of the Lehigh County District Attorney. Trooper Kelly's investigation spanned from October 2021 through September 2023, culminating in the charges of drug delivery resulting in death and [PWID]. In contrast, Trooper

- 12 -

Acevedo of the vice and narcotics unit led the Northampton County drug distribution investigation. This unit conducts covert operations targeting ongoing narcotics activity. After Trooper Kelly initially learned from Mr. Peters about his drug supplier, he referred this information to Trooper Acevedo, who then initiated a separate undercover investigation. Mr. Peters became a confidential informant and participated in two controlled purchases under Trooper Acevedo's supervision. The Northampton County charges, filed on November 3, 2021, arose entirely from this separate undercover operation and did not rely on Trooper Kelly's ongoing death investigation.

Importantly, Trooper Kelly had no role in the controlled buys, the evidence collection, or the decision to charge [Appellant] in Northampton County. His limited presence during the execution of the search warrant at [Appellant's] residence was merely to provide security for other occupants and to be available for potential questioning, which did not occur. Similarly, Trooper Acevedo's role in the … Lehigh County case was limited to sharing information about drug packaging after the undercover buys had concluded. The separation of these two investigations, each managed by a different unit, with distinct objectives, evidentiary focuses, and prosecutorial authorities (Northampton County District Attorney's Office vs. Lehigh County District Attorney's Office) further demonstrates to this court that they were independent law enforcement efforts and not one, unified criminal episode.

Next, … the two prosecutions differ fundamentally in proof requirements and legal issues. The Northampton County charges required proof that [Appellant] knowingly delivered controlled substances and used a communication facility to facilitate those deliveries. By contrast, the …Lehigh County case requires proof that [Appellant's] drug delivery on October 9, 2021 directly and substantially caused [Victim's] death. This involves evidence from forensic pathology, toxicology, and expert testimony, none of which played any role in the Northampton County case. Further, the witnesses differ: the Northampton County prosecution relied primarily on the testimony of Trooper Acevedo, law enforcement surveillance personnel …., the lab analyst from the PSP crime lab, and Mr. Peters' cooperation as a

confidential informant. The [Lehigh County] prosecution [would require testimony from] medical and forensic experts …, a representative from the coroner's office, … both Commonwealth and defense toxicology experts, and a lab analyst from PSP crime lab, as well as Trooper Kelly, Mr. Peters as a fact witness, and crime scene personnel … who collected evidence from the residence in [Lehigh County]. Also, the Commonwealth filed a … motion seeking to admit evidence of the subsequent controlled buys, which would require the testimony of Trooper Acevedo. Only three of those witnesses (Trooper Acevedo, Mr. Peters, and the PSP lab analyst) would overlap with the evidence presented at a trial [in] the Northampton County [case]. As such, the [Lehigh County] matter would involve [many] witnesses who have nothing to do with the Northampton County … case. The absence of substantial duplication of witnesses, issues of fact, or legal elements further militates that this court finds these cases do not share a logical connection necessary to be considered one criminal episode under [Section] 110.

(Trial Court Opinion at 16-19).

We agree with the court's analysis. The mere fact that Trooper Acevedo and Trooper Kelly cooperated and shared some relevant information with one another in their separate investigations does not require a conclusion that the two prosecutions stemmed from one criminal episode. *See Spotz, supra*. At the time the Northampton County charges were brought against Appellant, Trooper Kelly's investigation was still ongoing. Significantly, key evidence was still outstanding at the time, including the autopsy report, the analysis of the glassine baggies that were recovered near Victim's body, analysis of the cell phones recovered from Victim and Appellant's residences, and investigative interviews of Appellant and Mr. Peters. *See Hude, supra*. Further, as the trial court explained, although both cases involve Mr. Peters purchasing drugs

from Appellant, the context of Mr. Peters' involvement and the nature of the offenses vary significantly. In the instant case, the Commonwealth must also present significant medical evidence, in addition to the evidence of the drug sale, to prove that Victim's death resulted from the drugs procured from Appellant. On this record, we agree with the trial court that there is not a substantial duplication of issues of law and fact between the two prosecutions. *See Reid, supra*; *Forrester-Westad, supra*. As such, Appellant has failed to establish that the instant prosecution was barred by the compulsory joinder rule. *See* 18 Pa.C.S.A. § 110(1)(ii); *Perfetto, supra*. Accordingly, we affirm the court's order denying Appellant's motion to dismiss.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/1/2026